UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 25 CR 303 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JARED LEONARD | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Shortly after Congress enacted legislation providing financial assistance to those weathering economic harm resulting from the Covid-19 pandemic, it became apparent that billions of those dollars were being siphoned away by opportunistic criminals who lavishly spent the funds on personal extravagances. Defendant was one of these individuals. By submitting at least 10 fraudulent Economic Injury Disaster Loan ("EIDL") and Paycheck Protection Program ("PPP") loan applications to lenders and the Small Business Administration ("SBA"), defendant obtained funds totaling more than $2.3 million between approximately April 2020 and March 2021. Defendant used the funds to purchase, among other things, vehicles, international travel, and a luxurious personal residence located on more than 7 acres in Evergreen, Colorado (the "Evergreen Residence").

That was not the first time, however, that defendant engaged in financial fraud. During the 15 months prior to the Covid-19 pandemic, defendant, who was operating several restaurants in northern Illinois and Colorado, failed to pay over to the IRS federal income taxes, Social Security taxes, and Medicare taxes that he had withheld on behalf of his employees in amounts totaling more than $430,000.

To adequately protect the public, punish the defendant, and deter the defendant and others from committing similar crimes, the Court should impose a sentence of 32 months' imprisonment.

## I. The offenses of conviction

### A. PPP and EIDL fraud

*Background on the PPP and EIDL Programs*

The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the expansion of the Economic Injury Disaster Loan ("EIDL") program, which provided loan assistance (including advances of up to $10,000) for businesses with, among other things, 500 or fewer employees, and other eligible entities. The EIDL program was designed to provide economic relief to small businesses that were experiencing a temporary loss of revenue.

To gain access to funds through the EIDL program, small businesses applied through the U.S. Small Business Administration ("SBA") via an online portal and application. As part of the EIDL application process, the SBA required applicants to submit truthful information about the applying business, its owner, and its condition prior to the COVID-19 pandemic. This information included the applicant's number of employees as of January 31, 2020; its gross revenues and cost of goods sold for the 12-month period prior to January 31, 2020; the entity's type of

business (i.e., a business, a sole proprietorship, a cooperative, among others); and the date on which the current owner assumed ownership of the business. Information about the costs of goods sold and gross revenues was material to the SBA's approval, terms, and funding of loans. Applicants were required to electronically certify that the information provided in the application was true and correct and were warned that any false statement or misrepresentation to the SBA may result in sanctions, including criminal penalties.

EIDL Advance was a grant program offered as part of the EIDL program. EIDL Advance was designed to provide emergency economic relief to businesses that were experiencing a temporary loss of revenue as a result of the COVID-19 pandemic. EIDL applicants could request an Advance in their application for an EIDL loan. The amount of the advance issued to the small business was determined by the number of employees indicated on the EIDL application, $1,000 per employee, up to $10,000. The number of employees reported by the business was material to the SBA's funding of an EIDL Advance and determination of the amount of the EIDL Advance. If an EIDL advance was issued, the advance did not need to be repaid.

The CARES Act also provided authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program implemented by the SBA called the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $320 billion in additional funding for PPP loans.

To obtain a PPP loan, a business submitted a PPP loan application, which was signed by the applicant or an authorized representative of the business. The PPP loan application required applicants to acknowledge the program rules and make certain affirmative certifications regarding the eligibility of the business, proprietorship, or individual. In the application, businesses were required to provide, among other things, their number of employees and average monthly payroll. These figures were used to calculate the applicant's eligibility and the amount of money the business could receive under the PPP. Applicants were also required to make good faith certifications, including that that the business entity was in operation on February 15, 2020, and that economic uncertainties had necessitated their loan requests for continued business operations.

PPP loan proceeds were required to be used by the business for certain permissible expenses – payroll costs, mortgage interest, rent, and utilities. The PPP allowed the interest and principal on a PPP loan to be entirely forgiven by the SBA if the business spent the loan proceeds on these items within a designated period of time and used at least a certain percentage of the PPP loan for payroll expenses.

To obtain funds through the PPP, small businesses applied through lenders participating in the PPP, and if approved, received the loans from those lenders. The SBA and participating lenders required applicants for PPP loans to provide truthful information about the business and its owner, including truthful information about the business's gross income, the business's employees, and how the PPP loan proceeds would be used, which information was material to (i) lenders'

approval, terms, and funding of loans and (ii) the SBA's decision to guarantee and forgive the loans. BMO Harris Bank, located in Chicago, Illinois, and BOK Financial were FDIC-insured financial institutions and participating lenders for the PPP.

Applicants for PPP loans were required to certify that information contained in the application was true and accurate in all material respects and to acknowledge the applicant understood that knowingly submitting false information to obtain an SBA-guaranteed loan was punishable by criminal prosecution.

*The scheme to defraud*

For the purpose of fraudulently obtaining more than $2 million in PPP and EIDL funds, defendant caused applications for loans under the PPP and EIDL programs to be submitted on behalf of businesses he purportedly owned and operated to PPP lenders, such as BMO Harris Bank, BOK Financial, and to the SBA, which he knew included materially false statements and representations concerning, among other things, the purported entities' number of employees, average monthly payroll, cost of goods sold, gross revenue, the existence as companies with ongoing operations, and intended use of the funds. Defendant also caused false and fabricated documents to be submitted in support of several of those applications.

Between on or about April 2, 2020, and on or about February 27, 2021, defendant submitted at least ten EIDL and PPP loan applications on behalf of his businesses to PPP lenders and the SBA that he knew contained materially false and

fraudulent statements and representations. The loans were approved and defendant thereby caused the SBA and lenders to disburse funds in amounts totaling nearly $2.3 million dollars to accounts that he controlled at BMO Harris Bank ("BMO"), BOK Financial ("BOKF"), and TD Ameritrade ("TDA"), as further specified below.[1]

| **COVID Loan** | **Amount** | **MM/YY** | **Bank acct.** |
|---|---|---|---|
| Hamburger Stan PPP | $491,000 | 05/20 | BMO x7784 |
| SS Collective PPP | $264,498 | 05/20 | BMO x6142 |
| AJ's Pit BBQ PPP | $263,500 | 05/20 | BOKF x6566 |
| AJ's Pit BBQ EIDL | $160,000 | 06/20 | BOKF x6566 |
| Grabowski's EIDL | $160,000 | 06/20 | BOKF x6874 |
| Hamburger Stan EIDL | $150,000 | 06/20 | BMO x7784 |
| SS Collective EIDL | $160,000 | 06/20 | BMO x6142 |
| JLSS Holding EIDL | $150,000 | 09/20 | TDA x9153 |
| BBQ Supply EIDL | $150,000 | 09/20 | BOKF x6566 |
| SS Collective (2d draw) | $370,296 | 02/21 | BMO x6142 |
| **Total** | **$2,319,294** | | |

A number of the applications included false tax documentation, such as IRS Forms 940, which purported to document payments to employees during 2019 that defendant knew were inaccurate and had not been paid as the forms he submitted represented. For example, a false and fabricated IRS form 940 for 2019 was submitted by defendant to BMO Harris Bank on behalf of the PPP loan application for Hamburger Stan. Defendant also knew that a number of the PPP loan applications falsely identified the number of employees and average monthly

[1] The figures above for each EIDL include a $100 UCC filing fee that was deducted by SBA before the funds were distributed to the borrower. The figures above for the PPP loans do *not* include mandatory processing fees paid by the SBA to the lenders for each PPP loan, which totaled an additional $52,238.78. Thus, in total, the government submits that the restitution order for the SBA relating to the PPP loans and EIDLs should be in the amount of $2,371,532.78.

payroll of the applicants, and that a number of the EIDL applications falsely represented the applicants' gross proceeds and costs of goods sold during the 12 months prior to January 31, 2020. Financial records demonstrate that defendant used the funds to purchase, among other things, a personal residence, vehicles, and international travel.

For example, on May 23, 2020, just days after receiving the proceeds of his first 3 fraudulently obtained PPP loans in amounts totaling more than $1 million dollars,[2] defendant and his wife signed a contract with Redfin to make an offer to purchase the Evergreen Residence. Ex. A (listing photographs). When doing so, defendant provided a $25,000 earnest money deposit. Defendant paid the deposit by check immediately after he transferred $250,000 of the proceeds of the Hamburger Stan PPP loan into his personal TD Ameritrade brokerage account.

Defendant had a number of fraudulent EIDL applications pending at that time, and on June 2, 2020, he informed parties involved in negotiating the purchase of the Evergreen Residence that he was "considering doing this deal with all cash," and asked if he could put the title in the name of a business entity, rather than in he and his wife's personal names. During the next 10 days, *i.e.*, between June 4 and June 12, 2002, defendant received more than $609,000 in proceeds for EIDL loans and advances for Hamburger Stan, AJ's Pitt BBQ, SS Collective, and Denver Pizza Project, dba Grabowksi's Pizzeria.

[2] More specifically, deposits of (1) $491,000 on or about May 19, 2020, from BMO Harris for the Hamburger Stan PPP loan; (2) $264,497.50 on or about May 5, 2020, from BMO Harris for the SS Collective PPP loan; and (3) deposit of $263,500 on or about May 1, 2020, from BOKF for the AJ's Pit BBQ PPP loan.

Between approximately May 28, 2020, and June 10, 2020, defendant transferred $1,250,000 of the Covid-19 relief program funds described above to his personal TD Ameritrade brokerage account. The cash deal for purchase of the Evergreen Residence closed on or about June 17, 2020, after defendant wire transferred $1,229,011 to the closing agent from TD Ameritrade. After the closing, defendant transferred another $220,000 in COVID-relief funds to his personal TD Ameritrade account on or about June 12, 2020, and June 29, 2020.

Among other items, defendant used proceeds from the COVID-relief loan programs to purchase a recreational vehicle ($31,500), a Ford F-450 pickup truck ($74,000), and wrote checks from the TD Ameritrade account to pay at least $63,000 for various improvements to the Evergreen Residence. Defendant also used a TD Ameritrade debit card to pay for additional improvements to the Evergreen Residence (*e.g.*, a $5,200 mattress), and to pay for daily living expenses, such as purchases at local Walgreens, restaurants, and gas stations. Purchases totaling more than $5,600 in Las Vegas, Nevada, were also charged to the TD Ameritrade account in June 2020.

On September 1, 2020, after applying for an EIDL in the name of JLSS Holding LLC, the loan proceeds ($149,900) were deposited directly into defendant's TD Ameritrade brokerage account on his instruction. On the same day that the funds were deposited into his account, defendant's TD Ameritrade debit card was used to charge over $1,300 at the Four Seasons Resort Vail. The next day, the TD Ameritrade card was charged four times by United Airlines for $298.45, presumably

to buy 4 airline tickets. Additional Four Seasons and Vail Ski charges in the September statement for the TD Ameritrade account totaled more than $14,000. During October 2020, more than $12,000 was charged on defendant's TD Ameritrade account at the Four Seasons Hotel and other locations in Punta Mita, Mexico.

On or about September 8, 2020, defendant submitted an EIDL application to the SBA in the name of BBQ Supply Co.,[3] a defunct restaurant that he once ran in Chicago. The EIDL application was approved, and on or about September 11, 2020, the proceeds ($149,900) were deposited into the BOKF bank account (x6566) of AJ's Pit BBQ, a different restaurant he ran in Colorado. Defendant convinced the SBA to do so by providing it a counterfeit copy of a voided check for BOKF account x6566 which had been altered to indicate that it belonged to BBQ Supply Co. in Chicago, rather than AJ's Pit BBQ.

BOKF records indicate that two days before the fraudulently obtained EIDL funds were deposited into the AJ's Pit BBQ account, defendant withdrew $16,000 in cash the account. Defendant also withdrew $25,000 in cash from the AJ's Pit BBQ account on September 22, 2020. Additionally, defendant transferred $20,000 from the AJ's Pit BBQ account to his personal account (x4346) at BOKF on September 10, 2020, and transferred another $5,000 to the same account on September 28, 2020. During the next approximately 10 days, the AJ's Pit BBQ account was used to

[3] Although it had been closed for nearly two years, the EIDL loan application for BBQ Supply Co. indicated its "primary business address" was 6954 N. Western Avenue, Chicago, Illinois.

pay charges totaling more than $12,000 at the Four Seasons Punta Mita resort in Mexico, and to transfer an additional $6,000 to defendant's personal account (x4346) at BOKF.[4] Other charges on the bank statements (e.g., Starbucks, convenience store purchases, Peloton membership) indicate that defendant used the AJ's Pit BBQ account to pay daily personal expenses.

Defendant's defrauding of the PPP and EIDL programs did not conclude in 2020. On or about February 27, 2021, defendant submitted a second draw PPP loan application to BMO Harris Bank and the SBA on behalf of SS Collective, an Illinois limited liability company located in Chicago. In the application, defendant falsely certified that (1) he had used the full amount of the first draw PPP loan for SS Collective only for eligible expenses, (2) all information contained in the 2d draw PPP loan application was true and correct, and (3) he was not engaged in any activity that was illegal under federal, state, or local law. All of those statements by defendant were false. For example, in support of the second draw PPP loan application, defendant submitted spreadsheets which purported to provide sales data for 4 Budlong Hot Chicken locations in Chicago. The sales data provided, however, was false.

Nonetheless, the second draw PPP loan application for SS Collective was approved by BMO Harris and the SBA. On March 1, 2021, the loan proceeds, $370,296.50, were deposited into the SS Collective account at BMO Harris Bank. In

[4] At or about the same time, defendant's TD Ameritrade account was also being used to pay for purchases in the same region of Mexico.

the next several days, defendant distributed $355,000 from SS Collective account x6142 at BMO Harris Bank as follows:

| Date | Amount | Payee |
|---|---|---|
| March 2, 2021 | $ 55,000 | SS Collective LLC (Alpine Bank x2354) |
| March 2, 2021 | $ 55,000 | AJ's Pit BBQ (Alpine Bank x2198) |
| March 2, 2021 | $ 55,000 | Campfire Evergreen[5] (Alpine Bank x2339) |
| March 2, 2021 | $ 55,000 | Colorado Pizza Project (Alpine Bank x2305) |
| March 2, 2021 | $ 55,000 | SSC Denver LLC (Alpine Bank x9400) |
| March 2, 2021 | $ 25,000 | Dos Egos LLC (BMO x8638) |
| March 8, 2021 | $ 25,000 | Dos Egos LLC (BMO x8638) |
| March 9, 2021 | $ 30,000 | One Stop Construction ("deposit") |

As described above, defendant's plundering of the PPP and EIDL programs caused the SBA to suffer loss of more than $2.3 million dollars.

### B. Tax fraud

*Background*

Pursuant to the Internal Revenue Code and associated statutes and regulations, employers were required to withhold federal income taxes and Federal Insurance Contributions Act ("FICA") taxes from the paychecks of their employees, and to remit those employment taxes to the Internal Revenue Service ("IRS") on a quarterly basis.

The IRS required that employers report federal income tax withholdings and FICA taxes on an Employers Quarterly Federal Tax Return, Form 941. The IRS required employers to file the Form 941 within one month after the conclusion of the calendar quarter and to set forth the total amount of income tax withheld, the

[5] Campfire was another restaurant concept operated by defendant in Evergreen, Colorado.

total amount of FICA taxes due, and the total tax deposits made by the employer for that quarter. Defendant routinely did not do so.

*Failure to pay over federal income taxes and FICA taxes to the IRS*

On For example, or about October 31, 2019, defendant willfully failed to truthfully account for and pay over to the IRS the federal income taxes and FICA taxes withheld and due and owing to the United States for the quarter ending September 30, 2019, on behalf of the employees of Budlong Hot Chicken LLC ("BHC LLC"), the entity that paid wages to various employees of some of defendant's Chicago-based restaurants.

More specifically, defendant was an owner and manager of BHC LLC, an Illinois limited liability corporation that engaged in the business of preparing and serving food and beverage to retail customers for immediate consumption in and around Chicago, Illinois. As its owner and manager, defendant was a person required to withhold federal income tax, Social Security taxes, and Medicare taxes from the gross pay of BHC LLC's employees and to hold those taxes in trust until paying the taxes over to the IRS on a quarterly basis. Defendant also knew that BHC LLC was required to file an Employer's Quarterly Federal Tax Return, Form 941 ("Form 941") return one month after the end of each quarter that set forth, among other things, the total amount of wages paid to its employees, the income taxes withheld from those employees' gross pay, and the total amount of Social Security and Medicare taxes due to the IRS, which amount would have included the Social Security and Medicare taxes withheld from the employees' gross pay as well

as the additional Social Security and Medicare taxes that must be paid by the employer.

Between approximately January 1, 2019, and March 31, 2021, BHC LLC employed numerous individuals at its locations in Illinois and typically paid those employees on a bi-weekly basis. As defendant was aware, BHC LLC caused federal income tax, Social Security taxes, and Medicare taxes to be withheld from the gross wages paid to those employees during that time. Nevertheless, despite being aware of this withholding and his obligation to report and pay over the taxes withheld from the employees, defendant failed to account for those taxes by failing to file quarterly Form 941 tax returns disclosing the taxes withheld from BHC LLC's employees and failed to pay those withheld taxes over to the IRS.

The taxes withheld from the gross pay of BHC LLC employees included federal incomes taxes, Social Security taxes, and Medicare tax withheld from the employees of BHC LLC for the calendar quarter beginning on July 1, 2019, and ending on September 30, 2019. Defendant knew that he was obligated to file a quarterly Form 941 employer tax return for that quarter disclosing the amount of taxes withheld for that quarter and to pay over those taxes no later than October 31, 2019, but knowingly and willfully failed to do so.

In total, defendant caused the following losses to the IRS by failing to account for and pay over federal income tax, Social Security and Medicare tax (including amounts withheld for the employees as well as the employer portion) for BHC LLC employees between January 1, 2019, and March 31, 2020:

| Quarter | Tax Loss |
|---|---|
| Q1 2019 | $56,730 |
| Q2 2019 | $62,734 |
| Q3 2019 | $80,597 |
| Q4 2019 | $71,067 |
| Q1 2020 | $10,351 |
| **Total** | **$281,479** |

Defendant was also an owner and manager of Au Feu Denver LLC, a Colorado limited liability corporation that engaged in the business of preparing and serving food and beverage to retail customers for immediate consumption in and around Denver, Colorado. Au Feu Denver LLC was the entity that paid wages to various employees of some of defendant's Colorado-based restaurants. As its owner and manager, defendant was a person required to withhold federal income tax, Social Security taxes, and Medicare taxes from the gross pay of Au Feu Denver LLC's employees and to hold those taxes in trust until paying the taxes over to the IRS on a quarterly basis. In a like manner, defendant caused the following losses to the IRS by failing to account and pay over federal income tax, Social Security and Medicare tax (including amounts withheld for the employees as well as the employer portion) for Au Feu Denver LLC employees between January 1, 2019, and March 31, 2020:

| Quarter | Tax Loss |
|---|---|
| Q1 2019 | $12,233 |
| Q2 2019 | $32,694 |
| Q3 2019 | $34,979 |
| Q4 2019 | $38,291 |
| Q1 2020 | $34,714 |
| **Total** | **$152,911** |

In this manner, by failing to pay over withheld taxes for BHC LLC and Eu Feu Denver LLC, defendant caused loss to the IRS totaling approximately $434,390.

### C. Apprehension of defendant and resolution of the charges

Government agents sought to interview defendant in August 2022[6] at the Evergreen Residence.[7] Defendant agreed to speak with the agents briefly and made certain admissions to them, *e.g.*, that BBQ Supply Co. in Chicago had closed in 2018; that he was the individual who prepared certain PPP and EIDL loan applications; and that he had not filed tax returns for many years. Defendant stopped the conversation and informed agents that he planned to retain an attorney. Defendant was served with a target letter by the agents.

On or about November 14, 2024, defendant was indicted in Cook County on charges of sales tax evasion and other associated charges. After defendant failed to appear in Cook County court as ordered, a warrant for his arrest was issued in January 2025.

In approximately March 2025, media outlets in Denver reported that Colorado had seized a number of defendant's restaurant businesses over delinquent and unpaid taxes, and that defendant's employees were asserting he had not made required contributions toward their social security and Medicare benefits. Several employees repeated similar allegations in interviews with law enforcement. The

[6] Several days prior to the interview, law enforcement surveilled defendant driving a black Cadillac Escalade in the vicinity of Evergreen, Colorado.
[7] Defendant sold the Evergreen Residence in or about June 2024. PSR, ¶ 135.

former employees also stated that defendant was living in Mexico and running a restaurant business there.

Defendant was indicted in this case on June 5, 2025, and charged with 2 counts of wire fraud, 2 counts of bank fraud, 2 counts of interstate transportation of stolen property, and 1 count of conducting an unlawful monetary transaction with the proceeds of wire and bank fraud. A warrant for his arrest was issued by the district court.

Not long after the indictment was returned, defendant was detained by Mexican authorities and removed from that country to Denver, Colorado. Defendant was subsequently transferred in custody to the NDIL. He chose not to seek a bond and remains in federal custody. Defendant obtained appointed counsel upon his arrival in the NDIL. Shortly after doing so, defendant expressed an interest in resolving the charges pending against him, as well as uncharged federal tax-related allegations that the government had investigated. As a result, a superseding information was filed and defendant pled guilty shortly thereafter.

Prior to pleading guilty, defendant revealed to the government that he had an ownership interest ("Class A Units") in an LLC that he received in exchange for defendant's interests in the Budlong Franchise LLC.[8] The value of defendant's interest in the LLC is uncertain, he has no managerial or voting rights in the LLC, and its operating agreement does not provide defendant unilateral authority to liquidate his interest. In order to address his forthcoming restitution obligation,

---

[8] The transaction occurred between defendant and the LLC occurred on or about January 4, 2023.

defendant has agreed, among other terms, not to oppose to the entry of a charging order that will secure the government's interest in any distributions, dividends, or other payments that may be made by the LLC to defendant in the future.

### D. Presentence Investigation Report ("PSR")

The government has no objections to the PSR, which computed the USSG range in a manner identical to that provided in the plea agreement. Thus, Probation and the parties agree that defendant has a combined adjusted offense level of 21 for both counts of conviction and a criminal history category of I, resulting in a USSG range of 37 – 46 months imprisonment.

## III. Imposition of sentence

### A. Custody

Congress enacted the PPP and EIDL programs to assist the owners and employees of businesses impacted by the economic consequences of the Covid-19 pandemic. Seeking to put money into the hands of millions quickly in the face of a public health emergency, both programs were implemented by the government in a manner that relied to an extraordinary degree on applicants' honor and honesty, both as to their eligibility and their need for the funds.

Sadly, time has demonstrated that thousands obtained Covid-relief funds through dishonest means, and the defendant is one of many who selfishly abused this lifeline during a national crisis. In order to recognize the seriousness of the offense, account for the history and characteristics of the defendant, provide just punishment for the offense, and deter the defendant and to deter others from

committing similar crimes, the Court should impose a sentence of 34 months' imprisonment, slightly below the low-end of the applicable USSG range.

The gravity of defendant's crimes is the most aggravating factor. Targeting government benefit programs in general is a serious offense. Such schemes, however, generally involve relatively low dollar amounts sought by individuals who are themselves struggling financially: *e.g.*, a food stamp beneficiary trading benefits for cash, or a dependent continuing to spend monthly SSI benefits paid to a deceased social security beneficiary.

Defendant, in contrast, during a national crisis, targeted programs that he knew were intended to put big dollars into the hands of small business owners quickly. And through his ownership interest in numerous operating restaurants and their associated LLCs, he committed the fraud over and over and over again, stealing more than $2.3 million that neither he nor his businesses were entitled to receive.

Although the Covid-19 pandemic was a disaster for employers, the manner in which defendant obtained and used the relief funds he fraudulently obtained demonstrates he was *not* motivated by a desire to aid his employees or to keep his businesses afloat. He purchased a luxurious home on several acres in a scenic mountain town outright with cash taken directly from the Covid-relief programs. Defendant also subsequently purchased motor vehicles and travel to high-end resorts in Mexico and other locations. The crimes defendant committed were undertaken for his personal benefit, not to aid his employees.

Defendant's criminal actions also were not a hasty, rash response to the exigencies of the pandemic. Rather, defendant methodically gathered funds over the course of months – fabricating documents when necessary to support his lies – to buy the Evergreen Residence. He repeated his fraudulent actions in the months that followed, acquiring additional Covid-program funds to maintain his new lifestyle, to travel, and to support new business ventures – such as Campfire Evergreen in Colorado. The withholding tax fraud defendant committed for more than a year prior to the pandemic and his failure to file personal income taxes for many years both demonstrate that he was predisposed to fleece the PPP and EIDL programs to benefit himself financially.

The government does not assert that defendant left the United States simply to obstruct this prosecution. But doing so after he learned of the federal government's investigation and after he was charged with criminal offenses in Cook County is an aggravating factor. Defendant knew the day of reckoning for his crimes was approaching quickly. Rather than owning up to them and facing the consequences, defendant chose to flee, compounding his predicament and openly branding himself a fugitive from justice. These aggravating factors demonstrate that specific deterrence is needed and counsel for a significant period of incarceration.

A lengthy sentence of imprisonment is also necessary to adequately deter the public from committing similar misconduct in the future. Due to the nature of the rapidly spreading Covid-19 pandemic, Congress designed the PPP and EIDL

programs in a way that delivered financial aid quickly to those who qualified and needed it. In order to do so, the program relied heavily on information and certifications provided by borrowers through their applications. Little due diligence was conducted by banks or the SBA before funds were transmitted to applicants.

Sadly, many chose to take advantage of these programs. Losses due to fraud have been estimated by the SBA to total $200 billion.[9] Because so much money was made available to so many, so quickly, swift and serious punishment must be imposed to demonstrate to the defendant and the general public that dire consequences will befall those who have engaged in such crimes, or who may consider doing so in the future.

Defendant does present some facts in mitigation. He qualifies for the Zero Point Offender reduction provided by the USSG. Once he was ejected from Mexico by Mexican authorities and brought to justice in the United States, defendant quickly informed the government through counsel that he hoped to enter into a plea agreement to resolve the pending charges as well as the tax allegations. This saved the government significant investigative and prosecutorial resources and demonstrated his (eventual) willingness to accept responsibility for his crimes. Defendant further evidenced acceptance of responsibility by agreeing in a plea addendum not to oppose the filing of a charging order against his Class A Units in the LLC described in the PSR (¶ 134), and to notify the government of any distributions or other payments from that entity.

---

[9]https://www.sba.gov/document/report-23-09-covid-19-pandemic-eidl-ppp-loan-fraud-landscape. This figure is for the PPP as well as the EIDL program.

The aggravating factors and the need to provide specific and general deterrence weigh heavily, though, in favor of a significant sentence. For the reasons described above, the government asserts that a sentence of 34 months' imprisonment is sufficient but not greater than necessary to satisfy 18 USC § 3553.

**B. Financial**

Defendant should be ordered to pay restitution to the SBA in the amount of $2,371,532 as a result of the offense charged in Count 1 of the superseding information. PSR, ¶ 139. Restitution payments can be directed to the SBA in the manner described on page 12 of the GVO. Defendant should also be ordered to pay restitution in the amount of $434,390 to the Internal Revenue Service. PSR, ¶ 139. Directions on the manner to send restitution payments to the IRS were provided in the April 13, 2026, supplement to the GVO. The government does not recommend that the defendant be ordered to pay a fine.

**C. Terms of supervision**

Consistent with the recommendation of Probation, the government recommends that defendant be placed on supervised release for 3 years after he serves his sentence under the terms recommended by probation in the PSR, which appear necessary to monitor the defendant's compliance with the Court's orders, to enhance probation officer and defendant safety, to support defendant's reintegration into the community, to reduce recidivism, to promote responsible fiscal behavior and payment of restitution, and to protect the public.

## III. Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 34 months' imprisonment, 3 years of supervised release, and restitution in the amounts identified above.

Respectfully Submitted,

ANDREW S. BOUTROS
United States Attorney

By: /s/ *Brian Hayes*
BRIAN HAYES
Assistant United States Attorney
Brian.Hayes@usdoj.gov

Dated: July 28, 2026